IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No.  4:14-cr-00078 |
| | ) | |
| v. | ) | |
| | ) | |
| DONG PYOU HAN, | ) | DEFENDANT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

## INTRODUCTION

On June 17, 2014, the government obtained a four-count indictment charging the

defendant, Dong Pyou Han, with four counts of making false statements on or about December

10, 2009, March 11, 2011, March 29, 2012, and July 2, 2012, in violation of 18 U.S.C. §

1001(a)(2).  On February 25, 2015, Dr. Han formally accepted responsibility for his offense by

pleading guilty to two counts of the indictment.  On March 26, 2015, the Court accepted the plea

and adjudicated him guilty.  Pursuant to the plea agreement in the case, the government agreed to

dismiss counts three and four at sentencing.

The parties stipulated to several advisory sentencing guideline factors as part of the plea

agreement in the case, and the drafter of the presentence report concurred with the stipulations.

The presentence report drafter determined that Dr. Han's base offense level under the advisory

sentencing guidelines is 6.  (PSR ¶32).  Based on the loss amount calculated under the advisory

sentencing guidelines, 20 additional levels were added under USSG §2B1.1(b)(1)(K).  (PSR

¶33).  Because Dr. Han abused a position of trust, 2 additional levels were applied under USSG

§3B1.3.  (PSR ¶35).  After calculating Dr. Han's criminal history category as I, with no prior

criminal convictions (PSR ¶45), and applying a three-level reduction for acceptance of responsibility (PSR ¶¶39, 40), Dr. Han is at a total offense level of 25, and has an advisory sentencing guideline range of 57 to 71 months of imprisonment, with a statutory maximum term of 60 months of imprisonment on each count.  (PSR ¶86).  The only issue to resolve is what sentence is "sufficient, but not greater than necessary" for Dr. Han in this case under the factors contained in 18 U.S.C. § 3553(a).[1]

## SUMMARY OF THE LAW

The Supreme Court held in *United States v. Booker* that the mandatory nature of the federal sentencing guidelines system violated the Sixth Amendment of the United States Constitution.  543 U.S. 220, 226-27 (2005).  To remedy this, the Supreme Court modified the federal sentencing statute to make the sentencing guidelines truly guidelines – advisory, but not binding on the sentencing court.  *Id*. at 245.  Subsequent cases have affirmed the authority of the sentencing court to sentence within the range of choice dictated by the facts and applicable law of the case before it.  *See Gall v. United States*, 552 U.S. 38, 59 (2007) (upholding a sentence outside the advisory guideline range as reasonable); *Kimbrough v. United States*, 552 U.S. 85, 100-107 (2007) (noting that sentencing courts may vary from the advisory guideline range based solely on policy considerations, including disagreement with the policy underlying the guidelines in a case); *Rita v. United States*, 551 U.S. 338, 351 (2007) (stating that a district court may consider arguments that "the Guidelines sentence itself fails to properly reflect [18 U.S.C.] § 3553(a) considerations").  The result of this is that sentencing courts must "take account of" the

---

[1]  After meeting and examining the financial aspects of the case, the parties have reached a recommendation on what they believe is the restitution amount in the case, and will propose the Court accept the jointly recommended figure at sentencing.

advisory guideline range as part of all the sentencing goals and factors enumerated in 18 U.S.C. §

3553(a), but are no longer bound by the sentencing range indicated by the applicable guideline in

the case.  *Booker*, 543 U.S. at 261.  "[T]he Guidelines are not the only consideration, [and] the

district judge should consider all of the § 3553(a) factors" to fashion the appropriate sentence.

*Gall*, 552 U.S. at 39.  As required by the Sentencing Reform Act, the "overarching provision

instruct[s] [the] district courts to 'impose a sentence sufficient, but not greater than necessary' to

accomplish the goals of sentencing, including 'to reflect the seriousness of the offense,' 'to

promote respect for the law,' 'to provide just punishment for the offense,' 'to afford adequate

deterrence to criminal conduct,' and 'to protect the public from further crimes of the defendant.'"

*Kimbrough*, 552 U.S. at 89 (quoting 18 U.S.C. § 3553(a)).

## ARGUMENT

This case is about human failings.  In 2008, Dr. Han, a scientist and researcher, was part

of a research team headed by Dr. Michael Cho.  The team began to receive funding from the

National Institute of Health to conduct research looking for vaccines related to AIDS.  The

research involved injecting rabbits with the potential vaccine, and then spinning their blood to

separate the serum and check the results, mainly looking for the presence of antibodies that

suggested the vaccine may be working.  Dr. Han was the laboratory manager for the project, and

had access to the human and rabbit sera samples, and was responsible for providing the research

results to Dr. Cho.

In the summer of 2009, a sample of sera appeared to show neutralizing activity,

suggesting that the vaccine was having some success.  As laboratory manager, Dr. Han relayed

that information to Dr. Cho, and sent the samples to Dr. Montefori at Duke University, who was

responsible for reviewing and confirming the neutralizing activity.[2]  As indicated in the written

statement Dr. Han later provided, initially there was some sort of cross contamination with the

first sera sample, which inadvertently contained human antibodies, thereby making it appear that

the vaccine was having some success.  This led to incredible excitement within the research

team.  The team gathered its data and shared the information with other researchers and

interested parties.

      Only later did Dr. Han realize that the sera must have been contaminated.  Dr. Han,

however, could not bring himself to reveal that knowledge to Dr. Cho.  He could not bring

himself to dash the hopes of the research team, and all the others interested in the perceived

potential and progress of their efforts.  As Dr. Han indicated in his statement, he hoped and

expected that other derivatives being produced by the team would show a true neutralizing

activity, and in the meantime he made the foolish decision to spike subsequent samples so it

would appear that neutralizing activity was still occurring in subsequent samples.  He then

continued to present the resulting false data, to Dr. Cho.  Dr. Cho utilized that information in

applications to the NIH for grant funds to support continued research to follow up on this false

promise of progress in the research.

      The false statements to the government occurred in the grant applications and progress

reports Dr. Cho submitted to the NIH, both of which utilized Dr. Han's false data.  Dr. Han knew

that Dr. Cho was utilizing that information in the grant applications, which makes him

---

[2]  The review apparently consisted of Dr. Montefori examining samples and data from Dr. Cho's team that was provided by Dr. Han, and confirming that the data appeared to reflect what was in the provided samples.  It was not the type of review where the experiment is replicated from scratch, which is why the false data was not discovered for approximately two and half years when a collaborator took a closer look at a sera sample.

responsible for the false information and statements Dr. Cho unknowingly included in the grant applications and progress reports.  The NIH provided several grants over the next few years so that the team could continue researching a potential vaccine.  In December of 2012, the presence of human antibodies in the purportedly pure rabbit sera was discovered by a collaborating researcher.  This information was reported to the NIH, who, over the next few months, then investigated Dr. Cho's research laboratory and team at Iowa State University.  Dr. Han then confessed his research misconduct during this administrative investigation by the NIH and Iowa State University.  Dr. Han provided the written statement admitting his misconduct and taking responsibility for it.  He had accepted administrative penalties from the NIH prior to the commencement of the criminal case presently before the Court.  After the criminal charges were brought, Dr. Han continued to accept responsibility for his misconduct.  He entered into a plea agreement with the government, and pled guilty to counts of making a false statement.

The only remaining issue before the Court is what sentence is "sufficient, but not greater than necessary" for Dr. Han in this case under the factors contained in 18 U.S.C. § 3553(a).  In terms of the "nature and circumstances of the offense," as noted above, this case is an example of a human failing, an instance where initially just a simple mistake occurred that led to great hope and excitement among Dr. Han's friends and peers.  18 U.S.C. § 3553(a)(1).  Once he realized that a mistake had happened, Dr. Han could not bring himself to dash that hope and excitement. His criminal falsehoods in this case arose out of his inability to overcome that obstacle, followed by, in his own words a "coward[ly]" and "foolish" decision to replicate the error that elicited such euphoria, in the hope that future work would reach the same, but legitimate, results and progress.  (PSR ¶22).  Dr. Han allowed an accident to turn into a lie, and lacked the fortitude to

confront his friends and colleagues about what happened and what he subsequently did, and dash

their hopes.  As time passed, it became only more difficult to reveal the truth, and Dr. Han could

not bring himself to do it.  He is not the first person to fail to overcome such an obstacle in their

life.  It is always difficult to let people you care about down about matters that are important to

them, and the greater the importance, perhaps the more difficult it becomes to cause

disappointment.

But the problem, here, of course, is that the false statements led to the NIH continuing to

fund research to the tune of millions of dollars in grant money, which drives "the seriousness of

the offense."  18 U.S.C. § 3553(a)(2)(A).  It is the loss amount to the NIH that drives the

advisory sentencing guideline upward by twenty levels, along with the fact that Dr. Han abused

the trust shown in him as laboratory manager, which adds two more levels under the advisory

guidelines.  While one can speculate about how long and in what manner the NIH may have

continued to fund some of the team's research efforts absent the falsehoods, Dr. Han does not

dispute that his false statements were an instrumental part of the research grants and efforts, and

that the resulting harm flows from his actions.  Likewise, though undoubtedly some scientific

benefit was achieved from the other works of the research team and the efforts they all made, Dr.

Han accepts responsibility for the fact that his research misconduct materially influenced the NIH

in the bestowing and renewing of the grants the team received.  His acceptance of responsibility

has been sincere, in that he had acknowledged his misconduct prior during the administrative

investigation prior to the criminal case being pursued by the government.  The manner in which

Dr. Han has accepted responsibility for his actions is a reflection of his "history and

characteristics" that the Court should consider when deciding the sentence in this case.  18

U.S.C. § 3553(a)(1).

Indeed, Dr. Han is a man who has had an admirable life up until his actions that led to

this case.  Born in Seoul, South Korea in 1957, as the oldest child he helped raise his sisters

while his mother struggled with a gambling problem and his father worked outside the home.

(PSR ¶¶51, 52).  He was the first of the family to attend college, and paid his own tuition because

his parents were not supportive of his pursuit of higher education.  (PSR ¶51).  Over the course

of fifteen years, he went on to earn bachelor's and master's degrees in biology, and a doctorate in

virology from Sogang University in Seoul.  (PSR ¶71).  After his schooling, he worked as a

researcher, and his skills eventually brought him to the United States, where he continued his

work as a scientific researcher, first with the National Institute of Health from 1999 to 2001, and

then with Case Western University and Iowa State University as a researcher and professor from

2001 through 2013.  (PSR ¶74-76).  During that time, he got married, and has two children who

are now adult students in the United States.  (PSR ¶¶58, 59).  His wife and children are United

States citizens, and Dr. Han is a lawful permanent resident.  (PSR ¶62).  His history with law

enforcement consists of one citation for a seatbelt violation in 2002.  (PSR ¶44).  Dr. Han has

worked hard and led a good life.  Putting aside his actions in this case, he has doubtless

contributions to the scientific and educational communities through his work for so many years,

and has been a productive member of society.  The nature of this offense, his acceptance of

responsibility for his actions, and his history and characteristics, all suggest that a lengthy term of

incarceration is not necessary "to protect the public from further crimes of the defendant."  18

U.S.C. § 3553(a)(2)(C).

Nor is a term of incarceration necessary to provide Dr. Han with "needed educational or

vocational training, medical care, or other correctional treatment."  18 U.S.C. § 3553(a)(2)(D).

He is obviously a highly skilled and intelligent individual, and though a collateral consequence of

his offense has been the inability to work in his chosen field, his education ensures that he has the

knowledge and skill set to contribute to society in the future despite his offense, whether it be in

the United States or in South Korea.  He is deeply ashamed of his offense and regrets what he

did, so a prison sentence is not necessary to provide "correctional treatment" for this type of

offense behavior; this is not an individual who is a pathological liar nor a con artist, but rather a

man who got himself caught up in a lie that he was unable to confront.  The lie in this case was

inevitably going to be discovered.  Dr. Han knew it would inevitably be discovered, and that its

harm could only be mitigated if the research produced legitimate results as efforts continued, but

still could not bring himself to reveal the truth to Dr. Cho, the research team, and his colleagues

in the scientific community.  This is not a fraud case where Dr. Han received extra benefits or

money, as he only received his salary while the research continued, along with the prestige

accompanying the potential of the false data.  And even that prestige was inevitably going to be

lost when the truth was discovered, which Dr. Han knew would occur at some point in the future.

Again, the crime in this case is the false statements caused to be made; it is not an offense where

Dr. Han acted with a specific intent to defraud the government for his own financial benefit.  *See*

*Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993) (noting that a defendant's motive for

committing an offense is an important factor in determining what sentence to impose).

       In fashioning the sentence in this case, the Court must consider the advisory sentencing

guideline range.  18 U.S.C. § 3553(a)(4).  As noted above, the advisory guideline in this case is

driven primarily by the loss amount, which stems from the amount of funds provided by the NIH

to the research team, subsequent to the false statements included in the submitted materials.  The amount of loss can be an imprecise means of measuring criminal culpability, however, as it simply cannot be known how long and to what degree NIH may have continued to fund the research absent Dr. Han's false statements, just as the value of other aspects of the research, aside from Dr. Han's false data, cannot be quantified to offset the "loss" amount calculated under the guidelines analysis.  There is no dispute that a significant amount of funding was granted, and that Dr. Han's statements were material to those funding grants.  But the Court is in a better position to decide the degree of culpability to assess for Dr. Han's actions under the § 3553(a) analysis, rather than defer to the degree of culpability assessed by the guidelines.  The advisory guidelines for these types of cases are not based on empirical research and data, but rather adopted a prison before probation type of mentality that is reflected in the recommended sentencing range in this case.  *See* Justice Stephen Breyer*, The Federal Sentencing Guidelines and the Key Compromises on Which They Rest*, 17 Hofstra L. Rev. 1, 7 (1988) (noting that USSG §2F1.1 (now §2B1.1) was not developed based on past practices and national experience, but rather that the Sentencing Commission "decided to abandon the touchstone of prior past experience" with respect to white collar offenses); USSG, ch 1, intro, pt 4(d) (2014) (stating that the Sentencing Commission rejected pre-guideline sentencing practice of the courts in regard to certain economic crimes and wrote the guidelines in such a way that at least a short sentence of imprisonment would be the norm for economic crimes).  This is precisely the approach to criminal justice that is currently being debated by Congress and the public, as is reflected in the various forms of proposed legislation to reform the federal sentencing process.  The guidelines, after all, in their effort to be generally applicable to the greatest extent possible, were drafted in

such a manner that they lack a means to quantify a defendant's history and characteristics (outside of prior criminal history), or any mitigating factors beyond an acceptance of responsibility, so such mitigating factors were simply left out of the calculus. *See United States v. Ovid*, 2010 WL 3940724 at *1 (E.D.N.Y. Oct. 1, 2010) ("[T]he fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so."). The Court, however, in fashioning the sentence in this case, is free to note that the guideline in this case is not based on empirical data and national sentencing experience, and the Court is free to disagree with its recommendation. *See Kimbrough*, 552 U.S. at 101-02.

   The Court must also seek to fashion a sentence that "afford[s] adequate deterrence to criminal conduct."   Here, there is little reason to believe that Dr. Han has not already been deterred from any future criminal conduct.  His conduct is aberrational in an otherwise admirable life. *See United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (affirming significant downward variance from the sentencing guidelines where the defendant was a "'law abiding citizen, who [did] an incredibly dumb thing.'" (quoting district court rationale in affirming the decision)).  As a consequence of his actions, he has effectively lost the ability to work in his chosen field, has pleaded guilty to two felony charges, must make restitution to the NIH, and faces the likelihood that he will be removed from the United States and separated from his children, and possibly never permitted to return.  18 U.S.C. § 3553(a)(7); *see also United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (granting a downward variance based on collateral consequences of loss of position and reputation, widespread media coverage, and emotional toll to defendant of two public trials in the case).  He is deeply ashamed of himself,

-10-

and of the shame he feels he has brought on his family.  He regrets the hurt he has caused to his

friends and colleagues, the damage he has caused to government funded scientific research, and

the pain he has caused any members of the public who had high hopes based on his falsehood.

He does not need a sentence of imprisonment to be deterred from ever committing such an

offense in the future.  *See* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime &

Jus. 1, 28 (2006) (noting that research has consistently shown that "increases in severity of

punishments do not yield significant (if any) marginal deterrent effects" as opposed to the

deterrent force of knowing the certainty of being caught and that punishment will follow); *accord*

Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*,

91 Prison J. 48S, 50S-51S (2011) (observing that, according to "the best available evidence, . . .

prisons do not reduce recidivism more than noncustodial sanctions.").

Indeed, the fact that the Court is not mandated to impose a sentence of imprisonment for

a false statement offense is a reflection of Congress' recognition that false statement offenses

come in many forms and are committed by many types of people under many different types of

circumstances.  This is why, in terms of "the kinds of sentences available," the Court can impose

a sentence ranging from probation of one to five years, time served and supervised release of up

to three years, or a sentence of imprisonment followed by a term of supervision.[3]  18 U.S.C. §

---

[3]  As noted above, Dr. Han is a lawful permanent resident of the United States.  At this
point, an immigration detainer has not been placed on Dr. Han by the Department of Homeland
Security.  Assuming that the Department of Homeland Security is likely to pursue Dr. Han's
deportation or removal from the United States subsequent to his sentencing in this case, Dr. Han
urges the Department to consider granting him a voluntary removal at the appropriate time, and
indicates that he will cooperate with any future immigration proceedings.  The lack of an
immigration detainer at present means that a supervisory or probationary sentence imposed by
the Court can actually be implemented so long as Dr. Han remains in the United States and out of
administrative custody.  Regardless, Dr. Han's alienage has no role in determining what type of

3553(a)(3).  The Court has all available sentencing options from which to craft a sentence that is "sufficient, but not greater than necessary" for Dr. Han in this case.  But, in looking at the aforementioned nature and circumstances of this offense, in conjunction with Dr. Han's history and characteristics, it does necessarily follow that the lengthy term of imprisonment reflected in the advisory guideline range in this case is necessary to "provide a just punishment" for this offense.  18 U.S.C. § 3553(a)(2)(A).  The collateral consequences for Dr. Han in this case have been, and will continue to be, extremely significant.  The offense in this case is aberrant conduct from a person who has never had any prior difficulties with the law, and is extremely unlikely to have any future problems.  He does not suffer from any of the types of personal problems or characteristics that make him likely to reoffend in the future in any way.  He is 58 years old, a first offender, and his crime is non-violent.  A sentence that takes this into account is one that will "promote respect for the law," while "provid[ing] a just punishment" for Dr. Han.  *Id*.  No "unwarranted sentencing disparit[y]" will result from imposing a below-guideline sentence based on the unique circumstances of this case and this defendant.  18 U.S.C. § 3553(a)(6); *see also Gall*, 552 U.S. at 55 (cautioning sentencing courts to avoid unwarranted *similarities* among defendants who are different in ways not accounted for in the advisory guideline range).

While the ultimate decision as to what sentence is "sufficient, but not greater than necessary" for Dr. Han in this case is a manner firmly left to the discretion of the Court, Dr. Han respectfully argues that the advisory guideline range in the case recommends a greater than necessary sentence.  Dr. Han's inability to disclose the cross contamination once he discovered it,

---

sentence should be imposed in this case.  *See United States v. Onwuemene*, 933 F.2d 650, 651 (8th Cir. 1991) ("[S]entencing an offender on the basis of factors such as race, national origin, or alienage violates the Constitution.").

and his subsequent false statements that were presented to the NIH, reflect a human failing and the fear of disappointing others.  It was inevitably going to be discovered, but Dr. Han could not bring himself to reveal the truth to his colleagues until he was confronted during the administrative investigation in this case.  His weakness was one from which everyone has suffered at some point in their life and to some degree.  While the ramifications of his false statements were great, in that hopes were raised and the NIH continued to fund the research at significant cost to the government, Dr. Han received no benefit from his false statements beyond the ability to keep working on the research project in the hope that the teams' efforts would eventually produce real success.  He is regretful and ashamed, and will continue to accept the consequences for his actions.  Dr. Han asks that the Court take into account the nature and circumstances of this case, along with his history and characteristics, and impose a sentence substantially below the advisory guideline range in this case, and strongly consider imposing a supervisory sentence of some fashion in this case.

FEDERAL PUBLIC DEFENDER'S OFFICE
Capital Square, Suite 340
400 Locust Street
Des Moines, IA 50309-2353
Phone: 515-309-9610
Fax: 515-309-9625
E-mail: joe_herrold@fd.org

CERTIFICATE OF SERVICE
I hereby certify that on June 29, 2015, I electronically filed this document with the Clerk of Court using the ECF system which will serve it on the appropriate parties.
            /s/ Eliza Briggs

 /s/ Joseph Herrold                        
Joseph Herrold
Assistant Federal Public Defender
ATTORNEY FOR DEFENDANT